## IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE            )
APPLICATION FOR SEARCH          )        **Mag. No.:**
WARRANT FOR:                    )
                               )
**A Hewlett Packard Desktop Computer,**  )
**Serial Number:  MXL05009W2**          )

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Kevin Moore, Special Agent with the Federal Bureau of Investigation (FBI), Washington

Field Office (WFO), Washington, D.C., being duly sworn, depose and state the following:

1.      I am "an investigative or law enforcement officer" of the United States within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of, and to make arrests for, offenses

enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been

since January 2017.  I am currently assigned to a squad which investigates violent crime and

threats.  As a Special Agent with the FBI, I am authorized to investigate violations of the laws of

the United States, and I have been involved with numerous criminal investigations involving

violations of federal law.  I am a law enforcement officer with authority to execute arrest and

search warrants under the authority of the United States.  Prior to becoming a Special Agent with

the FBI, I was a police officer with the Norfolk Police Department for approximately (5.5) years

and was a homicide detective for approximately (1) year. I have received training in general law

enforcement and federal investigations.  I have also received specific training on the use of

electronic media and social media by investigation subjects. I have participated in the execution

of multiple search warrants in which evidence and instrumentalities of criminal activity have been seized.

3.        Based on my knowledge, experience and training, I am aware that:

a.        Those involved in threatening communications often use computers or other electronic media storage devices to facilitate the planning and execution of their criminal activities. They often use various websites, applications, and false information that conceal their communications from law enforcement in order to thwart detection by law enforcement.

b.        Electronic devices can store information for long periods of time and even when a user deletes information from a device; it can sometimes be recovered using forensics tools.

4.        The statements contained in this affidavit are based in part upon your affiant's personal participation in this investigation, physical surveillance, and information provided by Special Agents of the FBI and other law enforcement officers who participated in the investigation. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to obtain a search warrant for the computer referenced *infra.*

5.        On the basis of my knowledge concerning this investigation, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show there is probable cause to believe that the Hewlett Packard Computer with serial number MXL05009W2 (Target Computer) has data that furthers the investigation to show the intent to transmit in interstate or foreign commerce any communication containing any threat to injure the person of another in violation of 18 U.S.C. § 875(c). Specifically, there is probable cause to believe

that the computer described in paragraph 6 *infra*, contain evidence and instrumentalities of violations of the aforementioned offenses, as more fully described in **Attachment B**.

6.      Your Affiant requests a search warrant to search:

   a.      **A Hewlett Packard Desktop Computer,**
           **Serial Number:  MXL05009W2**

7.      Item (a) is a computer (hereinafter referred collectively as the "target device") seized after a Grand Jury Subpoena was served to George Mason University, located at 4400 University Drive, Fairfax, Virginia on May 23, 2017 detailed further in paragraph 9, and described in **Attachment A**.

## INTRODUCTION

8.      On May 3, 2017 at approximately 9:30 PM EDT, a threat was submitted into the Washington Post online customer service portal. The Washington Post is located at 1301 K Street, N.W., Washington, D.C., and the customer service portal is located at 1301 K Street, N.W., and the threat was reviewed at that location.  The threat was addressed to Washington Post reporter Wesley Lowery that read:

   **"hey wesley lowery. what up you piece of shit nigger lol!!!!! u can be killed and should all be killed!!! how about u write about nigger racism murders of non-blacks for once lol!!!!! wash post never writes about nigger hatred and racism does it lol!?!? well we know where u live and where going to kill u soon motherfucker lol!!!!"**

The Washington Post customer service portal was designed by Parature, which is a software company that is owned by Microsoft. Parature designed the customer service portal to produce a ticket with every inquiry to the Washington Post. On that ticket the date and time the inquiry was submitted is recorded. It also identifies the ticket origin and the reader/writer of the inquiry, which asks for a name and an email address for submission of the inquiry. The name

and/or email address are not verified before submission. The ticket also captures the system information of the computer that sent the inquiry.

The technical support staff at the Washington Post identified that the individual who submitted the threat was using the Mozilla browser on a computer with the IP address of 129.174.252.242. The technical support staff identified the IP address belonging to George Mason University, which is located at 4400 University Drive, Fairfax, Virginia.

## FACTS AND CIRCUMSTANCES

9.      On May 22, 2017, the affiant was assigned this case of possible interstate threatening communication. The affiant confirmed the IP address 129.174.252.242 belongs to George Mason University by inputting that IP address into an open source website Whois.com.

As a result of this and other information, On May 23, 2017, the FBI obtained a Grand Jury Subpoena that requested George Mason University provide the FBI with any and all user information related to electronic communications sent to the Washington Post on or about May 3, 2017 at approximately 9:30 PM EDT from IP address 129.174.252.242. Since this is an IP address that is associated with George Mason University, the university technical support staff provided information that the Target Computer and a second computer in the John Center Library were accessing the Washington Post at that time. The technical support staff did this by reviewing the server log, which provided the internal IP addresses of the two computers. The internal IP address is different for the two computer.

The director of IT Security for George Mason University, took custody of the Target Computer and the second computer and turned the Target Computer over to the George Mason University Police Department. On May 25, 2017, the Target Computer was turned over to your affiant. The IT director is maintaining custody of the second computer, which was in the library's

public space, if law enforcement needed to seize it at a later time. The IT director told your affiant that the second computer he has custody of has software (Deep Freeze) on it that wipes the system and deletes the data every time it reboots. With the Deep Freeze software a computer reboots minimum once a day. The IT director stated there would not be any data on the computer from May 3, 2017 because it has already been deleted.

The Target Computer was a library staff computer, and it does not have the Deep Freeze software. The Target Computer has a log-on page, but the staff use a generic username and password to access the computer. With the staff schedule and information from the computer, your affiant will be able to determine which staff member accessed the Target Computer at the time the threat was submitted to the Washington Post customer service portal. In addition, the server logs that show the two computers accessing the Washington Post at approximately 9:30 PM EDT were preserved by George Mason University and turned over to the FBI.

George Mason University believes it cannot give consent to access the computers without a search warrant because of possible Federal Educational Right and Privacy Act (FERPA) violations and they do not have a waiver that explains to the students or staff that their computer usage is subject to monitoring.

Based upon the aforementioned facts, your affiant submits that there is probable cause to believe that stored on the target device is evidence and instrumentalities of the offenses of the intent to transmit in interstate or foreign commerce any communication containing any threat to injure the person of another  in violation of 18 U.S.C. § 875(c).  The Target Computer is presently is in your affiant's custody at the FBI's Washington Field Office, however, upon approval of the search warrant your affiant will transport the Target Computer to the FBI's Computer Analysis

Response Team(CART) in Manassas, Virginia because that is the entity that can properly examine the Target Computer.

**TECHNICAL TERMS**

10.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     Computer:    A computer means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

b.     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

c.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a digital key to "unlock" particular data

security devices.   Data security hardware may include encryption devices, chips, and circuit

boards.  Data security software of digital code may include programming code that creates "test"

keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security

software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it

inaccessible or unusable, as well as reverse the progress to restore it.

d.      "Computer software" means digital information which can be interpreted by a

computer and any of its related components to direct the way they work.  Computer software is

stored in electronic, magnetic, or other digital form.   It commonly includes programs to run

operating systems, applications, and utilities.


**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

11.      As described above and in Attachment B, this application seeks permission to

search for records that might be found within the Target Computer, in whatever form they

are found.  One form in which the records might be found is data stored on a computer's

hard drive or on other electronic storage media or digital devices.  Thus, the warrant applied

for would authorize the seizure of electronic storage media and digital devices or,

potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

12.      Based on my training and experience, as well as information related to me by agents

and others involved in this investigation and in the forensic examination of digital devices, I

respectfully submit that within the Target Computer, there is probable cause to believe that the

records and information described in Attachment B will be stored in the Target Computer:

a.      Computer and other digital device files, or remnants of such files, can be

recovered months or even years after they have been deleted or viewed via the Internet.  Electronic

files downloaded to an electronic storage medium can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a computer, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

13.     *Forensic Evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media were used, the purpose of their use, who used them, and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of computers,

I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on the Target Computer because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computers can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.       Forensic evidence on a computer can also indicate who has used or controlled the computer.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer at a relevant time.

c.       A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.       The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.       Further, in finding evidence of how electronic storage media was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      Based on my training and experience, I know that when an individual uses a digital device with the intent to transmit in interstate or foreign commerce any communication containing any threat to injure the person of another, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

14.    *Methods To Be Used To Search Digital Devices.*  Based on my training and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching computers can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.  Computers may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of operating systems or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.   Searching computers can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.   Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.   As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a computer has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a computer.   For example, to rebut a claim that the owner of a computer was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the computer remotely is not present on the digital device.   Evidence of the absence of particular data or software on a computer is not segregable from the digital device itself.   Analysis of the computer as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Computer users can attempt to conceal data within a computer through a number of methods, including the use of innocuous or misleading filenames and extensions.   For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.   Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   Computer users may encode communications or files, including substituting innocuous terms for

incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Computers may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.      Based on all of the foregoing, I respectfully submit that searching the Target Computer for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be

necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

       f.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

       1.     As the evidence items have already been seized pursuant to a federal search warrant, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, law enforcement personnel previously transported the Target Computer, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B, to an appropriate law enforcement laboratory or similar facility for review.  Upon execution of this search warrant the Target Computer with related electronic storage media, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

       2.     The analysis of the contents of any seized computer or electronic storage media may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether

occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3. In searching the seized computer, the forensic examiners may examine as much of the contents of the computer as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized computer will be specifically chosen to identify only the specific items to be seized under this warrant.

**CONCLUSION**

15.     Based on the all of the forgoing information presented in this affidavit, I submit that there is probable cause to believe that the t-arget device possess information that would further the investigation into the offense of interstate communications with intent to threaten injury to a person in violation of 18 U.S.C. § 875(c), and that stored within the electronic memory and files of the target device is evidence and instrumentalities of that offense, as set forth more fully in Attachment A of this affidavit in support of an application for the issuance of the search warrant, which is hereby incorporated by reference.


_____
Kevin Moore, Special Agent
Federal Bureau of Investigation
United States Department of Justice


Sworn to and subscribed before me this _____ day of June, 2017


                                          _____
                                          ROBNIN M. MERIWEATHER
                                          UNITED STATES MAGISTRATE JUDGE
                                          FOR THE DISTRICT OF COLUMBIA

**<u>ATTACHMENT A</u>**

The property to be searched is a:

**a.       A Hewlett Packard Desktop Computer,
            Serial Number:  MXL05009W2**

This item is currently stored in an evidence locker at the FBI, Washington Field Office

located at 601 4th Street, N.W., Washington, D.C. 20535.

**ATTACHMENT B**

**Particular Things to be Seized**

I.      The items to be seized are fruits, evidence, information relating to, contraband, or instrumentalities of violations of 18 U.S.C. § 875(c) (intent to transmit in interstate or foreign commerce any communication containing any threat to injure the person of another).

II.     Electronic Storage media used in the commission of, or to facilitate, the above described offenses.

III.    For any electronic storage media or digital device whose seizure is otherwise authorized by this warrant, and any electronic storage media or digital device that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

1.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2.  evidence of software, or the lack thereof, that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

4.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

5.  evidence of the times the COMPUTER was used;

6.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

7.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

8.  records of or information about Internet Protocol addresses used by the COMPUTER; and

9.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers,

scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

IV.     For any data or information within the items described in Attachment A, the government is authorized to seize all information described above that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. § 875(c) (intent to transmit in interstate or foreign commerce any communication containing any threat to injure the person of another), including information pertaining to the following matters:

    (a)  Records and information relating to: The Washington Post and  Wesley Lowery;

    (b)  Records and information relating to the following financial records:

        a.  Books, records, ledgers, journals, statements, cash register receipts and/or tapes, invoices, billings, financial statements, balance sheets, notes and work papers;

        b.  All correspondence, letters, memorandum, applications, powers of attorney, and listings, which contain financial information, such as income, expenses, assets, liabilities, transfer of money;

        c.  Bank and other financial institution records, including bank statements, passbooks, deposit slips, withdrawal slips, cancelled checks, bank receipts, bank checks, money order receipts, wire transfers, credit and debit memos, and safe deposit keys and records;

        d.  Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency;

        e.  Loans or letters of credit including contracts, mortgages, notes, agreements, applications, payments, and financial statements;

    f.   Credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

    g.   Records indicating the purchase, lease, rental, possession or maintaining of equipment, vehicle inventory, capital assets and any other assets;

    h.   Records of real estate transactions, including contracts, agreements, settlement sheets, deeds, rental agreements, lease agreements, payments and receipts of money;

    i.   Records of personal and living expenses including bills, invoices, payments, receipts, invoices, statements, photographs, passports, airline tickets, records of travel and other evidence of expense; and

(c) Records and information relating to: employment records and personnel files including payroll journals, payroll records and correspondence that indicate cash payments to employees;

(d) Records and information relating to: address and/or telephone logs/books, Rolodex indices, diaries, calendars, and items reflecting names, addresses, telephone numbers, pager numbers, and/or fax numbers, e-mail addresses, and web sites of possible clients, customers, vendors, creditors, financial institutions, and other individuals or businesses with whom a financial relationship exists;

(e) Records and information relating to: customer lists, customer names, customer addresses, and customer telephone numbers. Customer billing records, customer payment records, and customer accounts receivable records. Correspondence to and from customers and associates;

(f) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(g) Evidence indicating the email account owner's state of mind as it relates to the criminal activity under investigation;

(h) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

(i) The identity of the person(s) who communicated with the user ID about matters relating to the intent to transmit in interstate or foreign commerce any communication containing any threat to injure the person of another.